Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Tel: (212) 946-9389
tkashima@brysonpllc.com

Daniel L. Warshaw (SBN 185365)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
Fax: (818) 788-8104
dwarshaw@pwfirm.com

***Attorneys for Plaintiff and the Class***

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHELLE GARZA, individually, and on behalf of herself and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KETTLE AND FIRE INC.,<br><br>Defendant. | Case No. 2:25-cv-10708<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Plaintiff Michelle Garza ("Plaintiff") by and through her counsel, brings this class action against Defendant Kettle and Fire Inc. ("Kettle & Fire" or "Defendant") to seek redress for its unlawful and deceptive practices in labeling and marketing its consumer food products.

2. Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein, which provides a variety of known health benefits including but not limited to, building and repairing tissue, blood sugar and muscle mass maintenance, energy, and overall health positive health impacts.

3. Defendant knows consumers are mindful of the number of grams of protein they consume, and thus, protein content is a material driver in the purchase of products promoting inclusion of protein. Thus, Defendant prominently labels its bone broth products including: Reduced Sodium Classic Chicken Bone Broth, Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth (hereinafter, the "Product(s)"),[1] with the specific amount of protein per serving on the Products' front labels and/or in the Nutrition Fact Panel ("NFP"). Consumers, in turn, reasonably expect that each Product will actually provide the amount and percentage daily value of protein per serving stated on the Product package.

4. The Food and Drug Administration ("FDA") regulations require that the number of grams of protein in a serving, expressed to the nearest gram, be included on a food product's NFP. 21 C.F.R. § 101.9(c)(7). The protein content in a food is "calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the 'Official Methods of Analysis of the AOAC International,' except when official AOAC

[1] Subject to further discovery, Plaintiff reserves the right to amend the Products at issue to include any other Kettle & Fire product that claims a specific amount of protein on its label that is inaccurate.

procedures described… require a specific factor other than 6.25." *Id.* This method is also known as the Kjeldahl Nitrogen testing method. Accordingly, food producers, such as Defendant, must ensure that their products actually contain the amount of protein listed on their labels.

5. Additionally, FDA prohibits front label claims about the amount of protein, unless manufacturers also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because FDA recognizes that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, regardless of whether reasonable consumers know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams on the front label does not actually inform consumers about how much usable protein they are actually receiving.

6. FDA required method for measuring protein quality is called the "Protein Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS. It combines a protein source's amino acid profile and percent digestibility into a factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of 0.5 means that only half of the protein in that product is actually available to support human protein needs. Thus, if the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving.

7. FDA prohibits manufacturers from advertising or promoting their products with a protein claim unless they have satisfied two requirements. First, the manufacturer must calculate the "corrected amount of protein per serving" based on

the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the NFP "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. §§ 101.9(c)(7)(i)–(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. *Id.*[2]

8. Based on Kjeldahl Nitrogen testing, it is clear Defendant misrepresents the total protein content of its Reduced Sodium Classic Chicken Bone Broth, Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth products. Plaintiff's testing of these Products shows that they contain less than 20 percent of what is reported on the products' NFPs (as well as on the front of the Product for the Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth products).

9. Defendant further provides a %DV on the NFP for its Reduced Sodium Classic Chicken Bone Broth, Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth. However, the %DV provided does not accurately represent the percent daily value of useful protein actually contained within the products.

10. As detailed herein, testing shows that the true %DV in these products is less than what is claimed. When tested using the PDCAAS methodology, it is clear that these products do not deliver the %DV advertised. Put simply, Defendant failed to provide a statement of the <u>*corrected*</u> amount of protein per serving calculated according to the PDCAAS methodology, expressed as a %DV, as required under

---

[2] For example, if a product contains 10 grams total protein per serving with a PDCAAS of 0.5, then the corrected amount of protein is 5 grams per serving and the %DV is 10% (5g ÷50g). For another example, if a product contains 10 grams total protein per serving with a PDCAAS of 1, and all of the protein in the product was useful in human nutrition, the %DV would be 20% (10g ÷50g).

federal regulations.

11. Consumers reasonably expect that Defendant's Products will actually provide the full amount of protein per serving claimed on the Products' labels and stated in the protein quantity section of the NFPs. But Defendant's Products do not do so. Had Defendant included a statement of the accurate amount of protein in grams, as well as the correct amount of protein per serving in the form of a %DV, as it was required to do under the law, it would have revealed that the Products provided less protein, and that the protein provided as nutritionally 0% of their total protein intake and contain low quality proteins. That information is material to reasonable consumers.

12. Defendant's unlawful and misleading protein claims caused Plaintiff and members of the Class to pay a price premium for the Products.

## PARTIES

13. Plaintiff Michelle Garza is an individual domiciled in Los Angeles, California.

14. Defendant Kettle and Fire Inc. is a corporation existing under the laws of the state of Delaware with its principal place of business in Austin, Texas.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and Plaintiff and Defendant are citizens of different states.

16. A significant portion of the injuries, damages, and/or harm upon which this action is based occurred or arose out of the activities engaged in by Defendant within, affecting and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in and/or derives substantial revenue from products provided to persons in the State of California. Defendant engaged, and continue to engage, in substantial and

continuous business practices in the State of California.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

18. Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Misrepresents the Protein in its Products

19. Defendant manufactures, distributes, markets, advertises and sells a variety of bone broth Products. These Products have packaging that predominately, uniformly and consistently states the Products contain a specific amount of protein. However, the Products at issue here, fail to do so.

20. The representations that the Products contain and provide an amount of protein per serving and container were uniformly communicated to Plaintiff and every other person who purchased any of the Products. Each of the Reduced Sodium Classic Chicken Bone Broth, Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth labels include the amount of protein and %DV on the label per serving. Additionally, the Classic Chicken Bone Broth, Mushroom Chicken Bone Broth and Turmeric Ginger Bone Broth also advertise the amount of protein per container on the front label.

21. By way of example, the same or substantially similar Product label appeared on each Product during the entirety of the Class Period:

**Reduced Sodium Classic Chicken Bone Broth**







**Classic Chicken Bone Broth**






**Mushroom Chicken Bone Broth**







**Turmeric Ginger Bone Broth**






22. As described in detail herein, Defendant's protein claims, which advertise the Products as containing and providing specific amounts of protein per serving/container, are unlawful and deceptive in that: (1) the Products misrepresent the number of grams of protein contained therein when tested using the appropriate nitrogen testing method; and (2) the Products' labels misrepresent the %DV of protein provided because Defendant fails to calculate the "corrected amount of protein per serving" based on the quality of the Products' protein using the PDCAAS method. Not only did Defendant misrepresent the protein contained in its Products, it did so in a manner that violated the federal Food, Drug & Cosmetic Act ("FDCA"), specifically 21 C.F.R. §§ 101.9(c)(7).

23. Indeed, Plaintiff tested the Products using both the Kjeldahl Nitrogen Test, as well as using the PDCAAS method and found Defendant drastically overstates the total amount of protein and the %DV of protein in the Products. The results of Plaintiff's testing are found below:

| Name of Product | Protein on Label | Protein Found in Testing (Kjeldahl) | %DV per Label (FDA: 50g/day) | %DV of Protein Found from Testing (PDCAAS) |
|---|---|---|---|---|
| Kettle & Fire Low Sodium Chicken Bone Broth | 17g | 1.62g | 8% | 0% |
| Kettle & Fire Classic Chicken Bone Broth | 19g | 13.08g | 5% | 0% |
| Kettle & Fire Mushroom Chicken Bone Broth | 19g | 12.79g | 7% | 0% |

| | | | | |
|---|---|---|---|---|
| Kettle & Fire Turmeric Ginger Bone Broth | 17g | 13.22g | 8% | 0% |

24. Here, each of the Products contained significantly less total protein in grams and contributed 0% to the overall daily value of protein when measured by PDCAAS. This is a significant and material misrepresentation.

25. Defendant's prominent protein claims deceive and mislead reasonable consumers into believing a serving of the Products will provide the grams of protein represented on the label, and a particular quality of protein, when that is not true. Had Defendant complied with the law, the statement of the total and corrected amount of protein would have revealed to consumers that the Products provide significantly less total protein than claimed, as well as that Defendant uses low quality proteins in the Products that do not contribute to the %DV protein needs of that individual. The absence of this information also allows Defendant to charge a price premium.

26. Defendant's failure to comply with § 101.9(c)(7) also makes the label claims unlawful under §§ 101.13(n) and (b). The unlawful protein claims induced consumers to purchase the Products at a premium price. Had Defendant complied with FDCA and related FDA regulations, accurately reporting the protein levels and quality contained therein as a %DV, reasonable consumers would not have purchased them or would have paid less for the Products.

27. Additionally, these representations render the Products adulterated under the FDCA, and therefore they should not (and could not) be legally sold.

**B. Consumer Demand for Protein**

28. Many American consumers are health conscious and routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing,

"[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet."[3] Indeed, FDA recommends relying on NFPs as the primary tool to monitor the consumption of protein.[4]

29. Protein is found throughout the body—in muscle, bone, skin, hair and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies confirm that protein can assist in weight loss, reduce blood pressure, reduce cholesterol and control risk factors for cardiovascular diseases.

30. Additionally, protein is particularly valued by those who are dieting, athletes, bodybuilders and individuals recovering from injuries. Protein provides the essential amino acids that build and repair muscle tissue. Protein is also a highly satiating nutrient, meaning it helps you feel full for longer. This can reduce hunger and promote weight management. Protein can help regulate blood sugar levels, which is beneficial for people with diabetes or prediabetes. Simply put, protein is the most sought-after macronutrient in food, when compared to carbs and fats. Many consumers build ketogenic (or "keto") diets which focus on maximizing protein intake.

31. Indeed, the National Academy of Medicine recommends that adults ingest a minimum of 0.8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[5] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that

---

[3] Transcript for FDA's Media Briefing on Front-of-Pack Labeling, October 20, 2009.

[4] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf.

[5] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*

means about 70 grams of protein each day. Most individuals have difficulty hitting these goals. That is why consumers seek out foods high in protein.

32. This is also likely why Defendant highlights the amount of protein in its Products. Space on a label is limited, and Defendant would not advertise the levels of protein in its Products if protein content was not seen as material to consumers.

33. But protein *quantity* by itself does not tell the full story from a nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins.

34. Proteins are not monolithic—they are chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of a protein changes the function of that protein in the body, and certain types of proteins are more easily digested and used by humans than others.

35. All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven amino acids on their own. Humans cannot produce—under any circumstances—nine of the amino acids. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

36. All nine essential amino acids are necessary for protein synthesis. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value.

37. As FDA explicitly recognized, "[b]ecause excess amino acids are not

stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all essential amino acids in the correct proportions is typically called a "complete protein."

38. A protein source's digestibility also affects the amount of usable protein a person receives from consumption. Plant-based proteins, like wheat and oats, are approximately 85% digestible, meaning 15% of the protein from those sources will simply pass through the body without ever being absorbed. This can greatly affect the bioavailability of protein in food.

39. Because reasonable consumers value protein, they also value high quality and digestible proteins over the alternative. This is why PDCAAS is important to consumers. PDCAAS measures a combination of digestibility and the least prevalent amino acid, correcting for any deficiencies in low quality proteins. And when PDCAAS is represented as a %DV, it provides consumers with a quick and easy way to compare the quality of protein between two competing products.

40. Given the importance of protein to consumers, it is understandable that FDA has specific regulations to ensure that food manufacturers accurately represent both the total amount and quality of protein in their food products. These regulations inform Plaintiff's misrepresentation claims.

**C. Federal Regulations Governing Food Labeling**

41. Federal laws regulate the content of labels on packaged food. The requirements of the FDCA, and its labeling regulations are applicable nationwide to all sales of packaged food products. Additionally, none of the state laws sought to be enforced here impose different requirements on the labeling of packaged food for sale in the United States.

42. The FDCA, 21 U.S.C. § 343(a), provides that a food is misbranded if

"its labeling is false or misleading in any particular." This requirement parallels state consumer protection laws, which prohibit false and misleading advertising. But, the FDCA's prohibition is also adopted by states in their own parallel food labeling laws, such as the California Sherman Food, Drug, and Cosmetic Law. Cal. Health & Safety Code § 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

43. Through the FDCA, FDA regulates the nutritional labeling of food, including the requirement to provide information about the level of certain nutrients like protein. *See* 21 C.F.R. § 101.9(c)(7). More specifically, the nutrition facts label regarding protein must include the protein content, "[a] statement of the number of grams of protein in a serving." *See id*. Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International." The AOAC adopted the Kjeldahl Nitrogen testing method, which was used in Plaintiff's own testing of the Products, as set out herein. But the FDCA not only requires that food labels contain the correct total amount of protein, but also ensures that other aspects of the protein content of food are accurately represented.

44. FDA specifically provides that food manufacturers must disclose the quality of their protein if they make certain protein claims. According to FDA regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . ***shall be given*** if a protein claim is made for the product . . . ." 21 C.F.R. § 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims. Additionally, if a manufacturer does provide a %DV for protein, it must be calculated as the corrected amount of protein per serving, not just

based on the total amount of protein in the product.

45. Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(ii).[6] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

46. Indeed, when promulgating 21 C.F.R. § 101.9(c)(7), FDA explained in published guidance that "[i]nformation on protein quantity alone can be misleading on foods that are of low protein quality." 58 Fed. Reg. at 2079 at 2101. It also explained that it was prohibiting manufacturers from making any protein claims at all *unless* the manufacturer provides a statement of the corrected amount of protein per serving in the NFP based on PDCAAS because "nutrition labeling must allow consumers to readily identify foods with particularly low-quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101–2.

47. Similarly, 21 C.F.R. § 101.13(i)(3), prohibits manufacturers from making a claim on a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made on the label." 21 C.F.R. § 101.13(b). This is true even if the same amount appears in the nutrition facts panel. 21 C.F.R. § 101.13(c).

48. Under the FDCA, the term "false" has its usual meaning of untruthful, while the term "misleading" is a term of art that covers labels that are technically true but are likely to deceive consumers.

---

[6] *See also* Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed October 3, 2025).

**D. Defendant's Marketing and Labeling of the Products Violates Federal and State Law**

49. Defendant's Products are unlawful, misbranded and violate State and Federal law. Defendant both misrepresents the amount of total protein in its Products, as well as the %DV, as required by 21 C.F.R. § 101.9(c)(7). Defendant's failure to comply with this requirement renders the label protein claims on each Product unlawful *per se* and the Products misbranded pursuant to §§ 101.13(n) and (b), as well as under § 101.9(c)(7), and parallel state law.

50. As noted herein, the total amount of protein in food products is material to consumers. Accordingly, misrepresenting the total amount of protein in the Products by over 20 percent is deceptive and misleading, rendering Defendant's Product labels literally false. Indeed, Defendant represents the Products contain between 19 and 17 grams of protein, but testing confirms that they may contain as little as 1.62 grams of usable protein.

51. Defendant also fails to provide an accurate %DV of protein on the Products' labels, misrepresenting the quality of protein contained therein. Consumers have a "limited knowledge and understanding of the amount of [protein] that [is] recommended for daily consumption," let alone an understanding of the science behind protein quality and how different types of proteins are used and absorbed in the body. 56 Fed. Reg. 60421. FDA requires a statement of the corrected amount of protein per serving in the NFP precisely to ensure that "consumers are not misled by information on only the amount of protein present" in a product with low quality protein. 58 Fed. Reg. 2079 at 2101–02.

52. Indeed, Defendant represents its Products have between 5 and 8 %DV of protein, when testing shows that it should be zero. Defendant's failure to provide a statement of the corrected amount of protein per serving for the Products renders those labels misleading.

53. Defendant violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9(c)(7), which were

implemented to prevent the false and misleading conduct described herein. These federal food regulations are also incorporated into several state's food laws, including in California. *See* Cal. Health & Safety Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). These are not just technical violations of food labeling law, but serious misrepresentations that harm both consumers and competition.

54. A reasonable consumer would expect the Products provide what Defendant claims on the Product labels and that the labels would not be contrary to the policies or regulations of FDA and advertised in violation of California law.

55. For example, reasonable consumers would expect that when Defendant labels its Products with "19g Protein Per Container," as it claims on the Classic Chicken Bone Broth Product label, the Product would provide 19 grams of protein per serving in a form their bodies could use as protein. However, testing shows that it only provided 13.08 grams of protein per container. Accordingly, Defendant's Product only provides 69 percent of the total protein advertised and labeled.

56. Additionally, the Classic Chicken Bone Broth Product label represents that the Product provides 5% of a person's daily value of protein, when accurate PDCAAS testing shows that it is actually zero. It is plain that Defendant did not use the *corrected* amount of protein per serving, as required, but calculated the %DV based on all of the 19 grams of protein it falsely represents is in its Product. Because Defendant did not provide an accurate statement of the corrected amount of protein per serving, expressed as a %DV, consumers have no idea that the Products contain nutritionally lower quality protein.

57. Similar misrepresentations also appear on Defendant's Reduced Sodium Chicken, Mushroom Chicken and Turmeric Ginger Bone Broth. All of these Products have less total protein in grams, and as %DV of protein, when compared

to what is reported on the label. Indeed, each of the Products have zero %DV of protein when tested using PDCAAS.

58. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. They would not know the true amount of protein the Products provide nutritionally merely by looking elsewhere on the Products. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer.

59. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of the Products does not provide the number of grams of protein that is represented on the label. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. The average reasonable consumer has no reason to suspect that Defendant's representations on the Products' labels are misleading. Therefore, consumers have no reason to investigate whether the Products actually do provide the amount of protein per serving that the Products' labels claim. Nor do consumers have a way to prevent their injury. Instead, consumers reasonably rely on Defendant's representations regarding the nutritional contents of the Products.

60. Additionally, Defendant's actions harm competition. In making false, misleading and deceptive representations, Defendant distinguishes the Products from its competitors' products. By using this branding and marketing strategy, Defendant states that the Products are superior to, better than and more nutritious than other products that do not make such overstated protein claims, correctly represent the total amount of protein contained therein or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the amount of protein their products actually provide.

61. Defendant intends and knows that consumers will and do rely upon

food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the product packaging, as Defendant does with the claims on the Products' labels regarding specific amounts of protein per serving.

62. Defendant continues to market its Products with the demonstrably false protein claims. Accordingly, consumers continue to be harmed by Defendant's fraudulent business practices. Because consumers are unable to confirm the accuracy of the nutritional labeling on Defendant's Products before purchasing them, they are unable to determine if Defendant's fraudulent business was correct, or if Defendant still misrepresents its Products' protein contents.

63. Defendant intended for Plaintiff and the Class Members to be deceived or misled. Defendant's deceptive and misleading practices proximately caused harm to the Plaintiff and the Class.

64. Because consumers pay a premium for products that provide more protein, by labeling the Products as containing more grams and %DV of protein per serving than they actually provide, Defendant is able to both increase its sales and retain more profits.

## PLAINTIFF'S EXPERIENCE

65. Plaintiff Michelle Garza purchased Kettle & Fire's Chicken Bone Broth multiple times from Amazon.com in the State of California during the Class Period. Plaintiff Garza purchased a monthly subscription of 6 packs of Kettle & Fire's Chicken Bone Broth for $38.47 a month, from November 28, 2024 until August 17, 2025.

66. Plaintiff Garza made each of her purchases after reading and relying on the truthfulness of Defendant's Product labels that promised that the Products provided a specific amount of protein per serving. She believed the truth of each representation, *i.e.*, that the Product would actually provide the specific amount of protein claimed on the labels in a form human bodies could utilize. Had Defendant

complied with the law and not made the protein claims on the Products' labels, she would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff Garza would have paid less for each Product.

67. Moreover, had Defendant followed FDA regulations and adequately disclosed the corrected amount of protein per serving for each Product expressed, in grams and as a %DV, Plaintiff Garza would not have purchased the Products or would have, at minimum, paid less for them.

68. Plaintiff Garza checks the NFP before purchasing products for the first time, and she uses that information as a basis of comparison between similar products. She looked at and read the NFP on the Product before purchasing it for the first time. She especially looks at the protein content on the NFP. Manufacturers do not always disclose a %DV for protein, but when they do, she prefers the product that provides more of the recommended daily amount of protein (*i.e.*, the one with a higher %DV). When a manufacturer does not provide a %DV for protein, she can only go off of the stated grams of protein, and she assumes that all of those disclosed grams are in a form her body can use as protein.

69. Plaintiff Garza continues to desire to purchase products that contain protein, including those marketed and sold by Defendant. Plaintiff Garza would like to purchase products that provide, for example, 19 grams of usable protein per serving if they are advertised as containing that amount. If the Products were reformulated to provide, in a usable form, the grams of protein that are represented on the labels, or the labels were reformulated to provide non-misleading information, Plaintiff Garza would likely purchase them again in the future.

70. Plaintiff Garza and members of the Class were economically damaged by their purchases of the Products because the advertising for the Products was, and remains, untrue and/or misleading under state law and the Products are misbranded; therefore, the Products are worth less than what Plaintiff Garza and members of the Class paid for them and/or Plaintiff Garza and members of the Class did not receive

what they reasonably intended to receive.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

71. For years Defendant had actual knowledge that the Products do not contain the amount of protein as listed on the Products' labels.

72. Defendant has a duty to accurately disclose the amount of protein in its Products. Yet despite its duty and knowledge, Defendant misrepresented that fact. Indeed, FDA regulations require that Defendant test and/or properly calculate the protein contents in its Products using specific methodology. Defendant must test and/or properly calculate protein contents of its Products and was aware of the falsity of its labels or failed to conduct the required testing, but labeled its Products with inflated levels of protein, knowing that it had no basis to do so.

73. Defendant made, and continues to make, affirmative misrepresentations to consumers to promote the sale of the Products, including that the Products contain certain amounts of protein.

74. Defendant misrepresented material facts that are important to Plaintiff and Class Members in deciding whether to purchase the Products. Defendant's misrepresentation was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.

75. As a result, Plaintiff and Class Members reasonably relied upon Defendant's affirmative misrepresentations of these material facts and suffered injury as a proximate result of that justifiable reliance.

76. The amount of protein in the formulation, design, and/or manufacture of the Products was not reasonably detectible to Plaintiff and Class Members.

77. At all times, Defendant actively and intentionally misrepresented the protein content in its Products and failed to inform Plaintiff and Class Members of the actual amount it contains. Plaintiff's and Class Members' lack of awareness was thus not attributable to a lack of diligence on their part.

78. The statements, words, and acts by Defendant were made for the

purpose of misrepresenting the truth that the Products do not contain the amount of protein as listed on the Products' labels.

79. Defendant misrepresented the accurate amount of protein in the Products for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

80. Due to Defendant's active misrepresentation to Plaintiff and Class Members of the true amount of protein contained in its Products, any and all applicable statutes of limitations that may otherwise be applicable to the allegations are tolled. Moreover, Defendant is estopped from relying on any statute of limitations in light of its active misrepresentation regarding the protein content in its Products.

81. Furthermore, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered the Products indeed did not contain the amount of protein listed on the Products' labels. Plaintiff and Class Members had no realistic ability to discern that the Products did not possess the alleged protein content until they learned the Products do not actually contain the represented amount. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active misrepresentation regarding the true nature of its Products.

## FED. R. CIV. P. 9(b) ALLEGATIONS

82. Although Defendant is in the best position to know what content it placed on its Product packaging, on its website(s) and on the websites of retailers of the Products during the relevant timeframe, and the knowledge it had regarding the protein content in the Products, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

83. **WHO**: Defendant made material misrepresentations of fact through its Products' packaging regarding the amount of protein in the Products.

84. **WHAT**: Defendant's conduct was, and continues to be, fraudulent

because it misrepresented the amount of protein in the Products, a fact that Defendant knew, or should have known, to be true, but nonetheless marketed, and continues to market, the Products as containing a specific amount of protein without disclosing the quality of protein or adjusting the Products' protein content in the NFP. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products contained more protein than the amount represented on the Products' labels. Defendant knew, or should have known, this information is material to reasonable consumers—including Plaintiff and Class Members—in making their purchasing decisions, yet it continued to pervasively market and label its Products as containing more protein than the Products actually contained.

85. **WHEN**: Defendant made material misrepresentations during the putative class periods and at the time Plaintiff and Class Members purchased the Products, prior to and at the time Plaintiff and Class Members made claims after realizing the Products did not contain the represented amount of protein, and continuously throughout the applicable class periods.

86. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations on the Products' labeling and packaging, its website(s) and the websites of retailers of the Products.

87. **HOW**: Defendant made material misrepresentations of material facts regarding the Products, including, but not limited to, the amount of protein in the Products.

88. **WHY**: Defendant made the material misrepresentations detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay a premium price for the Products, the effect of which was Defendant profited by selling the Products to many thousands of consumers.

89. **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent

Defendant's misrepresentations.

## CLASS ALLEGATIONS

90. Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), on behalf of herself and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class")[7]:

> During the fullest period allowed by law, all persons who purchased the Product in the State of California or any state with similar laws,[8] within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

91. Plaintiff further brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3)

---

[7] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Multi-State Consumer Protection Class and California Class.

[8] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Alaska (AS §§ 45.50.471, *et seq.*), Arkansas (Ark. Code §§ 4-88-101, *et seq.*), California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq*), Delaware (Del. Code tit. 6, §§ 2511, *et seq.*), District of Columbia (D.C. Code §§ 28-3901, *et seq.*), Florida (Fla. Stat. §§ 501.201, *et seq.*), Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*), Illinois (815 ICLS §§ 501/1, *et seq.*), Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*), Michigan (Mich. Comp. Law §§ 445.901, *et seq.*), Minnesota (Minn. Stat. §§ 325F.67, *et seq.*), Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*), New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*), New York (N.Y. Gen. Bus. Law. §§ 349, *et seq.* and §§ 350, *et seq.*), Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*), Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq.*), Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*), and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2d Cir. 2018); *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 201, 204 (W.D.N.Y. 2020); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

on behalf of herself and the members of the following class ("California Class"):

> During the fullest period allowed by law, all persons who purchased the Product in the State of California, within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

92. Members of the Multi-State Consumer Protection Class and California Class are referred to collectively as the "Class Members." Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definition, as necessary.

93. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

94. **Numerosity:** Plaintiff does not know the exact size of the Class but estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of its claims in a class action rather than in individual actions will benefit the parties and the courts.

95. **Common Questions Predominate:** This action involves common questions of law and fact to the potential Class because each Class Member's claim derives from the deceptive, unlawful, and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Classes are:

a. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are misleading;

b. Whether Defendant's actions violate the consumer protection laws invoked herein;

c. Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

d. Whether Defendant's failure to provide a statement of the corrected amount of protein per serving in the Products, despite prominent front label protein claims, was likely to deceive reasonable consumers;

e. Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

f. The profits and revenues Defendant earned as a result of the conduct;

g. Whether Class Members are entitled to restitution, injunctive, and other equitable relief and, if so, what is the nature (and amount) of such relief; and

h. Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

96. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

97. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class Members because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to Plaintiff for the unfair and illegal conduct of which Plaintiff complains. Plaintiff also has no interests that conflict with, or are antagonistic to, the interests of the Class. Plaintiff

retained highly competent and experienced class action attorneys to represent Plaintiff and the interests of the Class. By prevailing on her own claims, Plaintiff will establish Defendant's liability to all members of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

98. **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein and Class Members will remain at an unreasonable and serious risk of repeated harm. Defendant acted, or refused to act, on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate with respect to the Class as a whole.

99. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. Individual actions by members of the Class seeking individual remedies will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

100. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class

action.

## CAUSES OF ACTION

101. Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations are separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action:

## COUNT I
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
***(by Plaintiff, individually, and on behalf of the Multi-State Consumer Protection Class)***

102. Plaintiff, individually, and on behalf of the Multi-State Consumer Protection Class, realleges paragraphs 1 through 101 as if fully set forth herein.

103. Plaintiff and the Multi-State Consumer Protection Class Members were injured as a result of Defendant's violations of the state consumer protection statutes listed in paragraph 90, footnote 8, above. These state consumer protection statutes provide a basis for redress to Plaintiff and the Multi-State Consumer Protection Class based on Defendant's fraudulent, deceptive, unfair, and unconscionable acts, practices and conduct.

104. Defendant's conduct, as alleged herein, violates the consumer protection, unfair trade practices, and deceptive laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

105. Defendant's marketing of the Products violates these prohibitions by deceiving consumers into believing that the Products contain more protein than they actually do.

106. Defendant engaged in fraudulent and/or deceptive conduct which creates the likelihood of confusion or misunderstanding in violation of applicable law.

107. Specifically, Defendant advertised in a misleading and deceptive manner that the Products contain more protein than they actually do. Defendant chose to package, label, and market the Product in this way to impact consumer choices, extract price premiums and gain market dominance, as it is aware that all reasonable consumers who purchase the Products would be impacted by, and would reasonably believe, its false and misleading representations.

108. Defendant intended for Plaintiff and Multi-State Consumer Protection Class Members to reasonably rely upon the material misrepresentations concerning the true nature of the Products.

109. Defendant's misrepresentations and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, did cause Plaintiff and Multi-State Consumer Protection Class Members to be deceived about the true nature of the Products.

110. As a direct and proximate result of Defendant's misrepresentations, Plaintiff and Multi-State Consumer Protection Class Members suffered ascertainable losses.

111. Had they been aware of the true nature of the Products, Plaintiff and Multi-State Consumer Protection Class Members either would have paid less for the Products or would not have made the purchases at all.

112. Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class Members are entitled to recover compensatory, restitution, punitive, and special damages, including, but not limited to treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted by relevant law.

## **COUNT II**
## **VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

***(By Plaintiff, individually, and on behalf of the California Class)***

113. Plaintiff, individually, and on behalf of the California Class, realleges paragraphs 1 through 101 as if fully set forth herein.

114. Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

115. Plaintiff and California Class Members who purchased Defendant's Products suffered an injury by virtue of buying Products in which Defendant omitted the Products' true quality. Had Plaintiff and California Class Members known that Defendant omitted material information regarding the Products, they would not have purchased the Products.

116. Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this Complaint.

117. There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Products.

118. Plaintiff and California Class Members who purchased Defendant's Products had no way of reasonably knowing that the Products were deceptively packaged, marketed, advertised, and labeled, containing less protein than claimed. Thus, Plaintiff and California Class Members could not have reasonably avoided the harm they suffered.

119. Specifically, Defendant marketed, labeled, and represented the Products with the representations described herein, when in fact the Products contain less protein than advertised.

120. The gravity of the harm suffered by Plaintiff and California Class Members who purchased Defendant's Products outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous, and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and California Class Members.

121. The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Products and, thus, were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

122. Defendant violated the UCL's proscription against engaging in unlawful business practices as a result of its violations of California's False Advertising Law, as alleged below, in addition to breaches of warranty and violations of common law.

123. Defendant also violated the UCL's proscription against engaging in unfair business practices. Defendant's acts, omissions, and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code §§ 17200, *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

124. Defendant further violated the UCL's proscription against engaging in fraudulent business practices. Defendant's claims, nondisclosures, and misleading statements with respect to the Products, as more fully set forth herein, were false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

125. Plaintiff and the other California Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

126. As a result of Defendant's above unlawful, unfair, and fraudulent acts and practices, Plaintiff, on behalf of herself and all others similarly situated, and as

appropriate, on behalf of the general public, seek injunctive relief prohibiting Defendant from continuing these wrongful practices.

127. Additionally, Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and other California Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

## COUNT III
## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW ("FAL")
## California Business and Professions Code §§ 17500, *et seq*.
## (*By Plaintiff, individually, and on behalf of the California Class*)

128. Plaintiff, individually, and on behalf of the California Class, realleges paragraphs 1 through 101 as if fully set forth herein.

129. The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

130. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

131. Defendant violated the FAL by claiming its Products contained a certain amount of protein useful to the human body when they in fact contained far less usable protein.

132. At the time of its misrepresentations, Defendant was either aware the Products contained less protein than advertised, which no reasonable consumer would expect, given the labeling to the contrary, or was aware that it lacked the information and/or knowledge required to make an accurate protein representation. Defendant concealed, omitted, and failed to disclose this information to Plaintiff and California Class Members.

133. Defendant's descriptions of the Products were false, misleading, a material omission, and likely to deceive Plaintiff and other reasonable consumers.

134. Defendant's conduct therefore constitutes deceptive or misleading advertising.

135. Plaintiff has standing to pursue claims under the FAL, as she reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the Products when selecting and purchasing the Products.

136. In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Products, Plaintiff and California Class Members purchased the Products.

137. Had Defendant disclosed the true nature of the Products (that they are less protein-rich than advertised) Plaintiff and California Class Members would not have purchased the Products or would have paid substantially less for them.

138. As a direct and proximate result of Defendant's actions, as set forth herein, Defendant received ill-gotten gains and/or profits, including but not limited to, money from Plaintiff and California Class Members who paid for the Products, which did not contain the represented amount of protein.

139. As a result of Defendant's above unlawful, unfair, and fraudulent acts and practices, Plaintiff, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting Defendant from continuing these wrongful practices.

140. Additionally, Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and other Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**Civil Code §§ 1750, *et seq.***
***(By Plaintiff, individually, and on behalf of the California Class)***
**(*for injunctive relief only*)**

141. Plaintiff, individually, and on behalf of the California Class, realleges paragraphs 1 through 101 as if fully set forth herein.

142. Plaintiff and the California Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

143. Defendant, Plaintiff and the California Class are "persons" within the meaning of Cal. Civ. Code § 1761(c).

144. The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

145. The California Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770.

146. Defendant engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices, intentionally and knowingly made material misrepresentation regarding the protein contents of the Products, as

detailed above.

147. Specifically, by representing the Products contain a certain amount of protein (represented in grams and as a %DV) which was not provided, Defendant engaged in one or more of the following unfair or deceptive business practices as defined in Cal. Civ. Code § 1770(a):

a. Representing that the Products have characteristics, uses, benefits and qualities which they do not have.

b. Representing that the Products are of a particular standard, quality and grade when they are not.

c. Advertising the Products and/or with the intent not to sell them as advertised.

d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

Cal. Civ. Code §§ 1770(a)(5), (7), (9) and (16).

148. Defendant's unfair or deceptive acts or practices, including its concealments, omissions and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and California Class Members, about the true safety, quality and true value of the Products.

149. Plaintiff and the California Class suffered injury in fact and actual damages resulting from Defendant's material misrepresentations.

150. Defendant's violations present a continuing risk to Plaintiff and the California Class, as well as to the general public, and therefore affect the public interest.

151. Defendant is on notice of the issues raised in this Count and this Complaint by way of, among other things, the recalls they have initiated, as well as

their own intrinsic knowledge of defect.

152. Plaintiff also sent a notice letter to Defendant in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendant of its alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendant correct or agree to correct the actions described therein within thirty (30) days of the notice letter.

153. If Defendant fails to do so, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiff and California Class Members are entitled under the CLRA.

154. Attached hereto as **Exhibit A** is the venue affidavit required by CLRA, Cal. Civ. Code § 1780(d).

**COUNT V**
**BREACH OF EXPRESS WARRANTY**
***(By Plaintiff, individually, and on behalf of the California Class)***

155. Plaintiff, individually, and on behalf of the California Class, realleges paragraphs 1 through 101 as if fully set forth herein.

156. Defendant marketed, sold and/or distributed the Products, and Plaintiff and the Class Members purchased the Products.

157. California's express warranty statute provides that "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

158. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products; packaging and through marketing and advertising, as described herein.

159. The labeling, marketing, and advertising of the Products contained express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and the members of the Class and Defendant.

160. As detailed herein, Defendant made specific warranties and representations by representing the amount of protein on the Products' labels.

161. Defendant made these express warranties regarding the Products' quality and ingredients in writing through the Products' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Products.

162. Defendant's advertisements, warranties, and representations were made in connection with the sale of the Products to Plaintiff and the Class. Plaintiff and the Class relied on Defendant's advertisements, warranties, and representations regarding the Products in deciding whether to purchase the Products.

163. The Products do not conform to Defendant's advertisements, warranties, or representations in that they contain a substantially lower total protein and %DV of protein than warranted. Defendant was on notice of this breach as it was aware of the inaccurate %DV of protein in the Products.

164. Privity exists because Defendant expressly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Products contained, in usable form, the corresponding protein content. As alleged herein, the marketing of the Products was uniform, controlled and disseminated directly by Defendant. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of sales contracts between Defendant and their retailers and/or distributors and it is foreseeable that consumers would be injured by Defendant's breach. The retailers and/or distributors were not intended to be the ultimate consumers of the Products. Additionally, the Products are foodstuffs for which privity is not required.

165. Plaintiff and the members of the Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

166. As a direct and proximate result of Defendant's breaches of its express warranties and their failure to conform to the Products' express representations, Plaintiff and Class Members were damaged. Plaintiff and Class Members suffered damages in that they did not receive the Products they specifically paid for and that Defendant warranted them to be. In addition, Plaintiff and Class Members paid a premium for Products that did not conform to the Defendant's warranties.

167. On or about September 10, 2025, Plaintiff gave notice to Defendant that outlined Defendant's breaches of warranties as alleged herein by mailing a notice letter to Defendant's headquarters.

168. Defendant's counsel responded to Plaintiff's counsel, but ultimately, Defendant failed to take the corrective action requested by Plaintiff in her correspondence and Plaintiff was forced to file this action.

169. Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs and any other just and appropriate relief for Defendant's failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT VI
## UNJUST ENRICHMENT
***(By Plaintiff, individually, and on behalf of the California Class)***

170. Plaintiff, individually, and on behalf of the California Class, realleges paragraphs 1 through 101 as if fully set forth herein.

171. Plaintiff and members of the Class conferred a benefit on the Defendant by purchasing the Products.

172. Defendant is unjustly enriched in retaining the revenues from Plaintiff's and Class Members' purchases of the Products, which retention is unjust and

inequitable, because Defendant falsely represented that the Products contained specific amounts of protein per serving, while failing to disclose that the Products actually provided less protein than represented.

173. Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution and nonrestitutionary disgorgement of profits to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court. Plaintiff, and those similarly situated, have no adequate remedy at law to obtain this restitution.

174. Plaintiff, therefore, seeks an order requiring Defendant to make restitution and nonrestitutionary disgorgement of profits to Plaintiff and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and those similarly situated, respectfully requests that the Court enter judgement against Defendant as follows:

a. Certification of the proposed Classes, including appointment of Plaintiff's counsel as class counsel;
b. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent and unfair business practices alleged in this Complaint;
c. An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;
d. An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;
e. An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

f. An award of treble damages, except for those causes of action where treble damages are not legally available;

g. An award of restitution in an amount to be determined at trial;

h. An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial;

i. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

j. For reasonable attorneys' fees and the costs of suit incurred; and

k. For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 7, 2025

**BRYSON HARRIS SUCIU & DeMAY PLLC**

*/s/ Trenton R. Kashima*

Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

Daniel L. Warshaw (SBN 185365)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com

Melissa S. Weiner*
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pwfirm.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Class*